Opinion of the Court.
Thomas Denton and wife exhibited this bill in chancery against the administrators of Thomas Ashley, deceased, charging, that said decedent was the son of the female complainant, by a former husband ; that during her widowhood, she became possessed of sundry slaves, which passed to her from the estate of a deceased relative in North Carolina, where she resided, and that she removed with them to Kentucky, in some of the upper counties; that she entrusted the negroes aforesaid with her said son, for the purpose of his going in search of a suitable residence for her, and there making preparations for her family, and then he was to return and move her to it; that the son took possession of the slaves, for the purposes aforesaid, and, to her astonishment, did not return, nor was he heard of for several years, and was then discovered, by a person employed for the purpose of searching for him, to be living, with the slaves aforesaid, in the state of Tennessee. Some time after his discovery, he removed to the now county of Butler, in this state, *87 where he resided until his death, in 1817. That, after his return to Kentucky, he refused to surrender them, when demanded ; that they were increased, and are in the possession of said administrators and heirs. They allege that they are fully able to substantiate said facts by proof, and pray that the restoration of the slaves may be decreed, with payment of the hire.
Statement of the case.
The defendants, in their answer, put the complainants on the proof of their claim; but admit the possession of such slaves. They allege that they belong to the decedent, and that he had bought them from his mother, and exhibit writings purporting to be executed by her to that effect. They allege the claim is a stale one, and that the complainants had lived years in the same neighborhood with the decedent, and that they never asserted any claim, until his death. They plead the length of time as a bar to relief. They deny that the complainants are married, and allege that during her widowhood, the female complainant was married to, and cohabited with a certain Joseph Wiley, who is yet alive; and insist that if there is any right to the slaves, it is in him. They insist that there is no equity in the bill, and that the remedy is at law.
The complainants then amend their bill, and allege that the defendants claim the slaves by writing to the decedent from his mother, or a bill of sale. They allege that all such writings are either forgeries, or that they were obtained by fraud and deception on the female complainant, Mary Denton. They require the production of the writings, and pray that they may be cancelled or given up, and the negroes be recovered, with their hire. Pending the suit, Thomas Denton died, and his death was suggested upon the record, and the suit progressed to trial in the name of his widow, Mary Denton, in whose favor the court below decreed the said writings to be given up and cancelled, the slaves to be restored, and the hire to be paid. From this decree the administrators and heirs of Ashley appealed.
It is now contended, that the chancellor had no jurisdiction of the case, and that the remedy of the appellee is properly at law. On the other side, it is insisted, that the claim of the appellants is founded on a trust, and that the son took and held the slaves for the *88 use of his mother, and therefore the chancellor properly entertained jurisdiction of the case.
The jurisdiction of courts of chancery, assumed on the ground of trust, ought to be confined to controlling legal rights, vested and remaining in trustees, created as such & some legal manner, and not extended to all cases of abused confidence.
Placing slaves in the hands of a son, for the purpose of hit improving an estate with them for the parent, and then returning them, is not such a trust as will give jurisdiction to a court of chancery.
But should the son set up a claim to them as his own property, under an instrument of writing fradulently obtained the jurisdiction of a court of chancery would attach for the purpose of extinguishing such claim and then the court ought to decree a restoration of the slaves and a compensation for their services.
*88 It is true, that uses and trusts, are a favored part of the jurisdiction of the chancellor, and frequently, he will, on that ground, decide in cases where the law may be adequate to give relief. But, notwithstanding this acknowledged authority, it cannot be extended to every case where one party has trusted another or in other words placed a confidence which has been abused. If so, every case of bailment and every instance of placing chattels, by loans or hire, would be swallowed up by courts of equity. Nay, every case where credit was given for debt or duty, would soon be drawn into the same vortex. It ought then to be confined to cases of controlling legal rights vested and remaining in trustees created as such in some proper mode and not be extended to all cases of abused confidence. If the case therefore, of the appellee is to be tested by the original bill alone, We have no doubt, it makes out no case for the interposition of the chancellor; that placing the slaves in the possession of her son, for the purpose of preparing and improving her a home, and his right then to cease, was not such a trust as would sustain the bill, and that she had a plain and adequate remedy at law.
2. The answers of the defendants however, having set up claim under her by writing or bill of sale, and the amended bill being framed with appropriate charges to invalidate these writings, and require them to be annulled, presents the case in quite a different aspect; for, although forgery, and frequently, fraud in writings, may often be successfully attacked in a court of law, yet a chancellor will entertain jurisdiction to set aside such writings, surreptitiously and fraudulently obtained, with regard to either real or personal estate.
On the amended bill, therefore, although it is somewhat defective and general in its terms, the jurisdiction of the chancellor may be sustained.
It does appear satisfactorily made out in proof, that in the year 1805, while a widow, the appellee did obtain the slaves as a portion or legacy from the estate of her grandfather, through the instrumentality of her brother, into whose hands they came during her widowhood : that she removed with them to Kentucky, *89 and resided first in Lincoln. and then in Garrard county ; that from the latter place her son departed with the slaves in 1808 engaging to improve and prepare her a home, and remove her to it, and then took the slaves to Tennessee, where he remained with them several years ; that at length he came to this state, and on meeting his mother, recognized her title and agreed to restore them, but still failed to do so ; that she removed to Butler county, and lived beside him, when he sometimes amused her with acknowledgments of her title—with promises to support and maintain her, but never gave up the slaves until his death ; that on her having heard that he claimed some written title to them, and challenging him with alleging that he had a bill of sale for them he denied it. When asked, whether he had stated that he had any receipt acknowledging a payment for them or whether he in fact had paid a cent for them, he denied both. But his representatives now produce a writing, purporting to be signed by her, dated in 1804, before she had received possession of any of the slaves, acknowledging full satisfaction without specifying the sum, for her whole share of the legacy coming from her brother, and authorising him to receive and collect the same as her agent, when it was obtained by law. This writing was acknowledged by her before the clerk of Garrard county, on the 28th of November 1807, and by him recorded. On the 13th day of the same month, a writing is shown, purporting to be a confirmation of the first, reciting its date, fixing the sum received at one thousand dollars, and again renewing the authority to receive the same legacy. Of the execution of this latter writing there is no proof, and as its execution is contested, it cannot be permitted to prejudice her rights. The acknowledgment of the first is, however, we think, accounted for in a way not very creditable to the son. It appears there were two negroes more expected in Carolina. These she promised to give him, if he would stay with her, school her children and manage her affairs in her desolate state. To this he agreed ; but informed her, it was necessary for her to give some writing or authority to enable him to recover these latter slaves. This she agreed to give, and both started to Garrard court house, for the purpose of executing it, where, according to the son’s own confession, *90 he caused her to be intoxicated, by procuring, in his own language, the treat of a quart of rum, and thus procured from her the acknowledgment of this instrument. When to these confessions are added the facts, that she could not write, and only made her mark, and yet the writings are signed without such mark ; that the instrument is dated in 1804, before she had received any thing, covering the whole legacy; her receiving them afterwards, and retaining them without his open assertion of claim ; his accepting them from her, as her’s, in 1808, and his denial of having such paper afterwards, but little doubt can be entertained, that he had the address to palm upon her, under pretext of securing the two remaining negroes, the alienation of the whole legacy ; and this design of engrossing the whole, must have been conceived as early as 1804, or else the instrument must have been antedated, for the purpose of including the slaves she had already received, as well as those still due, which it would doubtfully do, if dated at the acknowledgment, when she had the negroes now in contest in her possession. The existence of the other instrument not established, although it can prove nothing against her, may betray a consciousness that his claim needed amendment, and that it was manufactured for that purpose. Under such circumstances, relief ought to be granted against this acknowledged instrument, unless something else in the cause presents a bar to that relief.
The defence, of another and lawful husband of the appellee being now living, set up in the answers, is not sufficiently supported by proof. It is shown that about the time the appellee had possession of these slaves, she did cohabit with a certain Joseph Wiley, to whom some said she was married ; but it seems that it was more a clandestine connexion and illicit cohabitation, than a real marriage, and was afterwards broken off, and she was married to Denton, as is clearly proved. However censurable her conduct may be in this respect, in a moral point of view, it cannot affect her right of recovery in this suit.
3. Nor is the plea of the statute of limitations available. Suits in chancery are not within the letter of the act, and it is in conformity with its spirit, that equity has adopted analogous principles, to which the chancellor allows more and other exceptions than those *91 allowed by the statute, some of which might avail the appellee ; but it is not necessary to resort to them. To keep these negroes out of the reach of the appellee, end render valid, by time, a title founded in fraud, was the evident design of the son, in removing them out of the state. Under such circumstances, it is very doubtful whether he or his representatives, according to the letter of the act, could ever make it a bar. But, in addition to this, it is not shown that five entire years elapsed, after his return and the appellee’s knowledge of it, previous to the commencement of this suit, although far more than five years had elapsed after he gained the first possession by leave of the appellee.
The statute of limitations does not, in terms, extend to courts of chancery; they have adopted it, but with other and more exceptions than it contains.
We, therefore, conceive that these writings were properly annulled by the court below; and as the jurisdiction of the chancellor can be supported for this purpose, and the right of the appellee is clear, we perceive no objection to full relief being granted, by a restoration of the slaves and the payment of the hire, as decreed by that court, without turning the parties round to a court of law, to finish the controversy, which the chancellor can do, and thereby avoid multiplicity of suits.
It is assigned for error, that the court below erred in making the administrators personally liable for the hire, without charging them out of the goods, chattels and slaves, which were of the decedent at the time of his death, and which had come to their hands to be administered. This error, we discover, is well founded. The decree is absolute against them, without regard to the fund out of which the hire is to be paid.
Although we approve of the decree in other respects, yet, in this it must be corrected, and must be reversed, and directions to the court below to enter the decree in conformity with this opinion.
Each party must pay their own costs in this court.